IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

LEE V.O.,[1]                      )
            Plaintiff,            )        Civil Action No. 5:21-cv-000038
                                 )
v.                               )        REPORT & RECOMMENDATION
                                 )
KILOLO KIJAKAZI,                 )        By:   Joel C. Hoppe
Acting Commissioner of Social Security,  )      United States Magistrate Judge
            Defendant.           )

Plaintiff Lee V.O. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28

U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the

applicable law, I cannot find that the Commissioner's denial of benefits is supported by

substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge

reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Lee applied for DIB and SSI in February 2018. Administrative Record ("R.") 326–35. She alleged that she became disabled on September 1, 2017, R. 326, because of post-traumatic stress disorder, chronic fatigue syndrome, sleep apnea, anxiety, and alcohol abuse, R. 363. Lee was fifty-three years old, or a "person closely approaching advanced age" under the regulations, on her alleged onset date. R. 171; 20 C.F.R. § 404.1563(d). Disability Determination Services ("DDS"), the state agency, denied her claims initially in July 2018, R. 126–52, 154, and upon reconsideration that December, R. 156–86, 188. In September 2019, Lee appeared without counsel and testified at an administrative hearing before ALJ Suzette Knight. *See* R. 81–119. ALJ Knight issued an unfavorable decision on October 31, 2019. R. 193– 204. In July 2020, the Appeals Council vacated that decision and remanded Lee's case to another ALJ to consider new medical evidence related to Lee's alleged physical impairments. *See* R. 210–12. In December 2020, Lee appeared with a non-attorney representative and testified at an administrative hearing

before ALJ H. Munday. R. 43–79. A vocational expert ("VE") also testified at this hearing. *See* R. 69–78.

On January 11, 2021, ALJ Munday issued a "partially favorable" decision finding that Lee was not entitled to DIB because she was "not disabled" before her insured status expired on September 30, 2018, but that Lee became "disabled" on July 15, 2019, and was therefore entitled to SSI benefits from July 2019 onward.[3] *See generally* R. 16–17, 19, 28–31. Put differently, ALJ Munday concluded that Lee was "not disabled" during two relevant periods: (i) for her DIB claim, from her alleged onset date ("AOD") of September 1, 2017, through her date last insured ("DLI") of September 30, 2018; and (ii) for her SSI claim, from the date she filed the application on February 8, 2018, through July 14, 2019, the day before her fifty-fifth birthday. *See* R. 30–31. ALJ Munday concluded that Lee became "disabled" for SSI purposes on July 15, 2019, because she moved into the "advanced age" category, 20 C.F.R. § 416.963(e), when she turned fifty-five. *See* R. 28, 30 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.06). Her findings as to the nature, severity, and functionally limiting effects of Lee's mental impairments—as well as her reasons for rejecting two providers' opinions indicating that those impairments would not have allowed Lee to function in an ordinary workplace on a regular and continuing basis—relate to the entire period between Lee's AOD (September 1, 2017) and the date ALJ Munday issued her decision (January 11, 2021). *See generally* R. 19–28.

\*

---

[3] "To qualify for DIB, [Lee] must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 655–56. Her insured status is not relevant to the SSI claim. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at \*4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501. Because SSI benefits cannot be paid for any period before the month in which the claimant filed her SSI claim, however, the earliest date on which Lee could establish "disability" for SSI purposes was February 8, 2018, the date she filed that application. *See* R. 30–31; 20 C.F.R. §§ 416.202, 416.501. Here, ALJ Munday concluded that Lee became "disabled" when she turned fifty-five years old on July 15, 2019. *See* R. 28, 30; 20 C.F.R. § 416.963(e).

ALJ Munday found that Lee had the following "severe" medically determinable impairments ("MDI") throughout the relevant period: degenerative disc disease, left-hip osteoarthritis, obstructive sleep apnea, obesity, "post-traumatic stress disorder, depression, and anxiety/panic" disorder. R. 19. She found that all other conditions documented in Lee's medical records, including "alcohol use disorder," were "non-severe" impairments. *Id.* None of Lee's severe MDIs met or medically equaled the relevant Listings. *See* R. 20–21 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 12.04, 12.06, 12.15). As part of her Listings analysis, ALJ Munday found that Lee's severe PTSD, depression, and "anxiety/panic" caused "moderate" limitations in her overall abilities to interact with other people and to maintain concentration, persistence, or pace; a "mild" limitation adapting or managing herself; and "no limitation" in her overall capacities for understanding, remembering, or applying information. *See* R. 21 (citing R. 756, 841, 1240, 1243, 1746).

ALJ Munday then evaluated Lee's residual functional capacity ("RFC") and found that she could perform "light"[4] work, but could only occasionally balance, stoop, kneel, crouch, and climb ramps and stairs; could tolerate occasional exposure to vibrations and hazardous conditions; and could not crawl or climb ladders/ropes/scaffolds. R. 22. She also limited Lee to "simple, routine tasks, 'low stress' work, defined as occasional independent decision making and few workplace changes" and "occasional interaction with supervisors," but "no interaction with the general public or co-workers." *Id.* This RFC ruled out Lee retuning to her past work as a

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these strength demands can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983); *see* R. 22 (finding that Lee could lift and/or carry "up to 20 pounds occasionally and 10 pounds frequently" and "stand[] and/or walk[] up to 6 hours and sit[] up to 6 hours in an 8-hour workday").

cosmetologist and foster parent. *See* R. 28. Relying on the VE's testimony, however, ALJ Munday found that this RFC would have allowed Lee to do certain light, unskilled jobs (non-postal clerk, laundry sorter, hand packer) existing in the national economy while Lee's chronological age put her in the "closely approaching advanced age" category under the regulations. *See* R. 29–30 (citing R. 73–74). When Lee turned fifty-five on July 15, 2019, she moved into the "advanced age" category and the regulations directed a finding that she was "disabled" as of that date. R. 30 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 202.06). Thus, ALJ Munday denied Lee's DIB claim in its entirety, but awarded Lee SSI benefits from July 2019 forward. *Id.* The Appeals Council declined review, R. 1–7, and this appeal followed.

## III. Discussion

Lee challenges the Commissioner's denial of benefits on two grounds. *See generally* Pl.'s Br. 4–22 (mental RFC finding and medical opinions); *id.* at 22–25 (appointments clause). First, she argues that substantial evidence does not support ALJ Munday's mental RFC finding—namely that Lee could perform "simple, routine tasks, [and] 'low stress' work, defined as occasional independent decision making and few workplace changes" and have "occasional interaction with supervisors" on a sustained basis—because ALJ Munday did not properly evaluate certain medical-source opinions indicating that Lee's mental impairments caused greater, arguably work-preclusive, functional limitations. *See generally* Pl.'s Br. 8–22 (citing R. 26–27, 754–56, 779, 794–98, 923, 934, 1592–94). Second, she argues that Andrew M. Saul, who was the Commissioner of Social Security when ALJ Munday issued her decision in January 2021, was appointed in violation of the Appointments Clause, U.S. Const., Art. 2, § 2, cl. 2, and, as such, Saul did not have constitutional authority to delegate power to the agency adjudicators

who denied Lee's claims. *See id.* at 22–24 (citing *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (June 20, 2020)).

Lee's first argument is persuasive. Moreover, ALJ Munday failed to explain how she made certain mental RFC findings, and her stated reasons for assigning different evidentiary values to conflicting medical-source opinions are internally inconsistent. *See* R. 26–27. Each error precludes meaningful judicial review, thus requiring reversal and remand. Accordingly, I do not address Lee's constitutional challenge.

A.    Summary

Lee's medical records document "prolonged traumatization of sexual abuse and neglect," R. 923, as both a child and adult, and treatment for complex and "significant psychiatric issues," R. 1743, including PTSD, depression, social anxiety, panic disorder, agoraphobia, insomnia, and chronic fatigue. *See, e.g.*, R. 511–12, 764, 779, 795–97, 834, 841, 848, 877, 923, 1173, 1239–45, 1450, 1592–94, 1715–20. Healthcare providers adjusted Lee's psychotropic medications several times throughout 2016. *See, e.g.*, R. 471 (May); R. 483 (Aug.); R. 497 (Sept.). In February 2017, Victoria Sullivan, NP, noted that Lee reported ongoing "significant depression/anxiety," R. 512, and insomnia that had not responded to "several agents," R. 511. She also reported "problems with focus and attention," which Nurse Sullivan explained were "common with depression and anxiety." *Id.* Lee's mood, affect, behavior, memory, and thought content were all "normal" on exam. R. 513; *see also* R. 538 (Mar. 2017); R. 554 (May 2017); R. 569 (June 2017). Nurse Sullivan referred Lee to psychiatry for a formal evaluation and stressed the importance of regular counseling to address her "significant" history of PTSD. R. 511–12.

Lee saw Jonathan Rittenhouse, Psy.D., on September 1, 2017. She described "longstanding feelings of worthlessness even in the [setting] of a deep social support network."

7

R. 877. Lee did not want to enter a partial hospitalization program ("PHP") to treat her alcohol dependence, but she was "open to 28 day inpatient rehab" and had "tentatively reserv[ed] time in October." *Id.*; *see* R. 422. Lee was "cooperative" on exam, but she exhibited "depressed and anxious" mood and endorsed both sleep disturbance and suicidal ideation. R. 876–77. Dr. Rittenhouse noted that Lee was "coping with [an] acute increase in symptoms secondary to new insight and perspective," and opined that she had "moderate" functional impairment and stress levels at the time. 877. A few days later, Delaney Snyder, PA, noted that Lee presented with normal behavior, speech, cognition, and thought processes, but that she endorsed passive suicidal ideation and exhibited "depressed" mood with a "tearful" affect and "fair" judgment. R. 639–40. Lee was taking Lexapro, Lunesta, Prazosin, and Xanax at the time. R. 638. NP Sullivan's exam notes indicate that Lee presented with "normal" mood, affect, behavior, memory, and thought content in late September 2017. R. 607. That October, Lee told PA Snyder that she had experienced "an epiphany" and "realized all of a sudden that maybe she had been wrong; maybe she has [self]worth after all." R. 642. This realization, along with two new medications, had helped Lee cut down on her drinking. *Id.* Her mental status exam was normal that day. R. 643. PA Snyder refilled Lee's Lexapro and Naltrexone, increased her dosages of gabapentin and prazosin, decreased Lunesta with a plan to taper off, and told Lee to start "us[ing] Xanax more sparingly." R. 644.

In January 2018, Lee established care with Melissa Morgan, NP, after moving from Harrisonburg to Charlottesville. R. 658–59. NP Morgan's exam notes state only that Lee was fully oriented and presented with "pleasant mood, normal affect." R. 661; *see also* R.683, 706 (Mar., Apr. 2018). She changed Lee's psychotropic medications and recommended that she see a counselor for PTSD. In mid-February, Lee started seeing Karen Durland-Jones, LCSW, to

address "increasing symptoms of anxiety, PTSD, and depression that [were] significant enough to impede her ability to work as a professional hairstylist and [had] led to an increase in alcohol abuse." R. 764; *see* R. 762–65. Lee explained that the "symptoms manifest in the form of persistent and intrusive thoughts of self blame and self criticism, fearful thinking, and memories of . . . traumatic childhood abuse," as well as "significant fatigue and hopelessness on a daily basis (including suicidal thoughts)." R. 764. Ms. Durland-Jones noted that Lee exhibited an "anxious" and "depressed" mood with "reactive and mood congruent" affect during this initial visit, but her findings on mental-status exam were otherwise normal. R. 763. That June, Lee told NP Morgan that she was "more depressed" and wanted to increase her Cymbalta. R. 727. She was pleasant, but had an "anxious" affect on that day's exam. R. 729. NP Morgan increased her Cymbalta.

In June 2018, Lee wrote a letter to DDS explaining she was "as anxious and depressed as [she] ever felt, with increased social anxiety." R. 420. She could not "shop in a grocery store or do practically anything away from home without panic attacks." *Id.*; *see* R. 419 ("Panic attacks . . . cause me to isolate in my home."). Lee lived with a "perpetual cycle of memories and emotions trying to process" her trauma, which were "sometimes paralyzing," excessive "worry and feeling hopeless," "profound social anxiety," R. 419–20, as well as night terrors and insomnia, R. 375. Her ability to handle stress "depend[ed] on the situation." R. 380. She was "good during crisis, then [would] breakdown later." *Id. See, e.g.*, R. 423 ("When I get triggered like that, which happens quite often in different ways to varying degrees, I go to bed. On this particular day it was around 2pm. *DONE* with that day."). Lee got along "very well" with authority figures and was "good" at handling changes in routine. R. 380. She later explained that she left the house only to attend her appointments, to take her daughter to appointments or to her

father's house, and to "get[] groceries and other essentials." R. 422; *see* R. 377–78 (Lee stating

that she shops in grocery stores "twice weekly for about 30 minutes" and runs other "errands 2-3

monthly" on her "better days"). "All of those things require[d] self-talk, deep breathing and then

phoning a friend" for support. R. 422; *see, e.g.*, R. 423.

Howard Leizer, Ph.D., reviewed Lee's records for DDS in July 2018. *See* R. 131–36,

144–49. He opined that Lee had "chronic PTSD secondary to trauma," R. 132, 143, and

continued to experience depression, "heightened anxiety, difficulty sustaining attention and

concentration, and trouble getting along with others," R. 135, 148, despite regularly attending

counseling and taking Cymbalta, Xanax, Lunesta, and Prazosin, R. 132, 145. More specifically,

Lee's severe MDIs and related symptoms "moderately limited" her abilities to maintain attention

and concentration for extended periods; to perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; to work with or around others "without

being distracted by them"; to complete a normal workday and workweek without interruptions

from psychological symptoms and perform at a consistent pace without taking unreasonable

breaks; and to interact appropriately with supervisors, coworkers, and the public. R. 134–35,

148. Dr. Leizer opined that Lee "should be restricted to simple unskilled work." R. 135, 148. He

did not put any specific restrictions on Lee's abilities to interact with other people; to maintain

concentration, persistence, or pace; or to deal with workplace stress. *See* R. 132–35, 144–48.

In November 2018, Ms. Durland-Jones completed a DDS Mental Status Evaluation

Form. *See* R. 753–56 (Ex. 7F). She noted that she had seen Lee for individual counseling about

once a week since mid-February of that year. R. 754; *see* R. 757–61. Ms. Durland-Jones noted

that Lee was fully oriented, "cooperative [and] engaged," but that her "mood can be labile[,]

moving from sadness to anger quickly"; her "thoughts can be tangential . . . [and] include

paranoid thinking"; she was "distracted"; and she "struggle[d]" with recalling details,

"maintaining focus," and staying on task. R. 755–56. She opined that "stress due to [Lee's]

anxiety symptoms ha[d] made daily functioning difficulty [for her] over the last year." R. 756.

Jo McClain, Psy.D. reviewed Lee's updated records for DDS in December 2018. *See* R.

157–67, 172–82. Dr. McClain agreed with Dr. Leizer that Lee's chronic PTSD, anxiety, and

depression symptoms "moderately limited" her abilities to maintain attention and concentration

for extended periods; to perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; to work with or around others "without being distracted

by them"; to complete a normal workday/workweek without interruptions from psychological

symptoms and perform at a consistent pace without taking unreasonable breaks; and to interact

appropriately with supervisors and coworkers. R. 166–67, 181–82. She added that Lee's

symptoms "markedly limited" her "ability to interact appropriately with the general public" and

that Lee therefore "should avoid work with [the] public," but could have "occasional interaction

with supervisors and co-workers." R. 167, 182. Dr. McClain also opined that Lee could "perform

at least simple work for two hour blocks to complete a normal workday/workweek." *Id.* She did

not restrict Lee's ability to deal with workplace stress. *See* R. 166–67, 181–82.

Ms. Durland-Jones completed a more detailed Mental Medical Source Statement in

January 2019. *See* R. 794–99 (Ex. 14F). She opined that Lee's chronic PTSD, major depressive

disorder, and generalized anxiety disorder, R. 794, caused numerous "signs and symptoms,"

including "recurrent and intrusive recollections of a traumatic experience, which [were] a source

of marked distress"; apprehensive expectation; decreased energy; "difficulty thinking or

concentrating"; generalized persistent anxiety; "persistent disturbances of mood or affect";

emotional withdrawal or isolation; and "recurrent severe panic attacks manifested by a sudden

unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring

on the average of at least once a week." R. 795. Based on her examinations, Ms. Durland-Jones

opined that Lee was "unable to meet competitive standards"[5] when it came to maintaining

regular attendance and being punctual within customary, usually strict tolerances; sustaining an

ordinary routine without special supervision; completing a normal workday and workweek

without interruptions from psychologically based symptoms; and dealing with normal work

stress typical of unskilled, semiskilled, or skilled work. R. 796–97. Lee was "seriously limited"[6]

in her abilities to maintain attention for two-hour segments, to work with or around others

without being unduly distracted by them, to make simple work-related decisions, to respond

appropriately to changes in routine "unskilled" work setting, and to "set realistic goals or make

plans independently of others." R. 796–97. Ms. Durland-Jones attributed these limitations to

Lee's "emotional symptoms of excessive worry, overly fearful thinking," "intrusive memories of

abuse," "overwhelming anxiety" that caused "physical symptoms of muscle tension, heart

palpitations, and shortness of breath," and propensity for panic attacks. *Id.* She also noted that

Lee was "easily overwhelmed" in unfamiliar settings and did "not want to leave her home." R.

797. Lee found "stressful" many of the most basic "demands of work," including "working

within a schedule," making decisions and completing tasks, dealing with supervisors, coworkers,

and strangers, "getting to work regularly," and staying at work for a full day. R. 798. Finally, Ms.

Durland-Jones opined that Lee's impairments or treatment would cause her to miss more than

four days of work a month and that her impairments had lasted or could be expected to last at

---

[5] "'Unable to meet competitive standards' means [the] patient has noticeable difficulty (e.g., distracted from job activity) from 21 to 40 percent of the workday or work week." R. 796.

[6] "'Seriously limited' means [the] patient has noticeable difficulty (e.g., distracted from job activity) from 11 to 20 percent of the workday." *Id.*

least twelve months. *Id.* Two months later, Ms. Durland-Jones wrote another Medical Opinion

Statement explaining that Lee could not work because her "symptoms of PTSD are present on a

daily basis and frequently do not allow her to leave her home or complete daily living tasks." R.

779. Those symptoms included "intrusive thoughts and images of past trauma"; "intense distress

when exposed to internal or external clues," or triggers, "that symbolize the traumatic events";

trouble concentrating; fatigue; hypervigilance; and panic attacks marked by tachycardia,

shortness of breath, shaking, sweating, and flushes. *Id.* Ms. Durland-Jones thought it "highly

unlikely" that Lee could "consistently show up at work or complete a work day due to these

symptoms." *Id.* Even if Lee could get to work and stay a full day, her symptoms were "present

on an almost daily basis greatly reducing her ability to be reliable . . . and work competently." *Id.*

Also in January 2019, Lee established care with Louisa Hann, M.D., at Sentara Blue

Ridge Internal Medicine. *See* R. 847–51. She had not taken any medications for three months,

noting that they caused side effects and she had "had a hard time finding new mental health care"

since moving to Charlottesville. R. 848. She still saw Ms. Durland-Jones for individual

counseling on a regular basis. *Id.* Lee reported fatigue, agitation, decreased concentration,

memory loss, anxiety, sleep disturbance, increased alcohol use, and depressed mood. *Id.* Dr.

Hann's findings on that day's mental-status exam were normal. R. 850. "Given the chronicity,

severity and complexity of [Lee's] diagnoses," however, Dr. Hann "strongly recommended

establishing care with a local psychiatrist." R. 847. In February, Lee told another provider that

she continued to see Ms. Durland-Jones for "ongoing panic attacks, hypervigilance, and

insomnia secondary" to PTSD. R. 841. Lee reported "more depression and irritability" in March,

R. 834, and "ongoing anxiety and depression" in May, R. 1173. *See also* R. 422–23 (Mar. 2019).

In August, Lee told Dr. Hann that her "anxiety symptoms [and] depression symptoms ma[d]e it

very difficult to focus on anything and get any significant work done." R. 1159. Her mood,

affect, and memory were "normal" during all three visits. R. 837, 1162, 1177.

In August 2019, Ms. Durland-Jones and Dr. Hann each submitted a narrative letter

supporting Lee's disability claims. R. 922, 923. Ms. Durland-Jones explained that she had

provided individual therapy to Lee "on a weekly basis" since November 2018 to address Lee's

"prolonged traumatization of sexual abuse and neglect" and "increasing symptoms of PTSD,

anxiety, and depression that [were] significant enough to impede her ability to . . . engage in any

regular form of employment." R. 923. More specifically, Lee exhibited "persistent feelings of

sadness and worthlessness, episodes of disassociation, ruminative preoccupation with trauma

events, . . . significant periods of self isolating from social interaction, persistent distrust of

others and difficulties in enacting self protective and self care activities." *Id.* Ms. Durland-Jones

explained that Lee's symptoms were "frequently present (often on a daily basis)" and that, "as a

result," she was "often unable to leave her home or engage in normal daily activities." *Id.* Dr.

Hann opined that Lee was "unable to be employed in any full-time job due to . . . emotional and

physical deficits that do not allow her to focus on tasks or deal with any stressful or emotional

situations." R. 922. In September 2019, Lee testified that she had trouble paying attention and

concentrating, making decisions, and interacting with other people. R. 105. She did not have any

problems understanding information or instructions. *Id.* Lee thought her "biggest" limitations

were "the people factor," R. 117, meaning that she "can't work with public, coworkers or even a

supervisor[,]" R. 118, and "not being able to show up consistently" or "only working when [she]

feel[s] like it," R. 117.

That October, Lee established care with psychiatrist Jenny Lee, M.D., in Charlottesville

to get "help with anxiety and depression." R. 1239; *see* R. 1239–45 (Ex. 26F). Lee said she had

"'social anxiety' because she hasn't been able to leave her house except 'when I have to' since moving to Charlottesville" two years earlier. R. 1239; R. 1240 ("Endorses panic attacks. She does not leave the home due to fear of panic attacks."); *see* R. 1245 ("She finds it difficult to leave her home and meets the criteria for panic disorder with agoraphobia."). "She leaves for appointments" and "will go to the grocery store if she has to, but her thoughts end up revolving around" whether she could work there, causing her to "get[] upset about the thought of talking to other people and the fact that she is not working." R. 1239. She had "no problem . . . talking to competent people" who she "feels safe" with. *Id.*; R. 1240 ("She goes out to meet people that she feels connected to and supported by."). Lee was "able to enjoy 'some things,'" but "she wish[ed] she could have 'a little bit more joy and energy'" in life. R. 1239; R. 1240 ("She is able to experience joy and has interests she gets pleasure out of."); *see also* R. 1245 ("[S]he does not meet criteria for MDD or PDD as she is able to experience joy and has interests."). Lee tapped her foot occasionally during exam, had "depressed and anxious" mood, her affect appeared euthymic with periods of tearfulness when discussing her history and smiling when talking about things that brought her joy, and her insight and judgment were fair. R. 1243–44. Dr. Lee opined that Lee "had a chronically elevated risk for self harm due to her mood disorder and maladaptive coping skills of drinking alcohol," but that her "imminent risk of inability to care for self" was "low" given that she had a stable residence and could "maintain all ADLs" at that time. R. 1244; *see* R. 1241 ("Living Situation: lives with her daughter in an apartment over the garage of her landlord's home. She helps 'tidy up' for her landlord rather than pay rent. She helps with laundry, dishes, etc."). Dr. Lee restarted Lee on Prozac and gabapentin and continued her on Trazodone. R. 1245.

15

That November, Lee told Dr. Hann that she leaves her house "only" to go to "medical clinics and grocery stores," and that she can "get to the mall once a year when she really needs" to. R. 1450. Dr. Hann's findings on mental-status exam were normal. R. 1453. In December, Lee told Dr. Lee that she "noticed some improvement in her social anxiety, however she still felt nervous about coming to this appointment." R. 1467. She recently "had a significant panic attack when she came to a realization" during counseling. R. 1467; *see* R. 1828. Lee also wanted to clarify that her activities of daily living ("ADLs") mostly involved "tidying up the kitchen for her landlord only when her landlord is out of the home for an hour a day." R. 1467; *see* R. 1241. On exam, Lee's mood was "better" than at the last visit, but she was "somewhat anxious" and "frustrated when discussing her disability application." R. 1470. Her attitude, behavior, speech, thought processes and content, cognition, memory, and impulse control were all normal. *Id.* Insight and judgment were still "fair." *Id.*; *see* R. 1243–44. Dr. Lee increased Trazadone and Prozac for Lee's anxiety and continued her other medications. R. 1471.

In January 2020, Lee told Dr. Lee that "she had been doing well for the past few days, however on the way here [to this appointment] she had to pull over for a panic attack after her tire, phone, and GPS all had consecutive problems." R. 1828. She described her mood as "I had a panic attack," but her affect was euthymic and most other findings on exam were normal. R. 1830. Her insight and judgment were still "fair." *Id.*; *see* R. 1243–44, 1470. Dr. Lee continued Prozac and Trazadone and increased gabapentin "for alcohol cravings, anxiety, [and] insomnia." R. 1831. Things were "going pretty well" for Lee in early April 2020. R. 1802. She didn't "feel super depressed" or hopeless at that time. *Id.*; *see* R. 1804 ("Mood: I don't feel super depressed. Affect: Congruent to stated mood."). She also explained that she "gets most stressed when leaving the house, therefore she has been less stressed due to the [COVID-19] public health

emergency." R. 1802; *see* R. 1804 ("Thought Content: Discusses her decreased guilt of not being social due to the current restrictions of [public] activities.").

Later in April, Lee reported having "an unwitnessed acute onset seizure-like spell" where she "lost consciousness for about 15 seconds . . . followed by postictal-like state confusion and fatigue." R. 1743–44. She went to the emergency room ("ER") three times that weekend "with concern for seizure." R. 1743. Lee was "verbose" and "slightly manic" during a telehealth visit with Dr. Hann a few days later. R. 1746. She said that "she was treated poorly" in the UVA ER, which triggered her PTSD, and she felt "like she switched personalities that night during her ER visit" because "her previous personality could not handle this well." R. 1744. Lee spent most of her visit with Dr. Hann "detailing her current personality[,] which is a change from her normal persona. . . . [The] current personality is brash, say[s] . . . what she thinks, does not worry about what other people think, cusses a lot, and takes what she wants." *Id.* Dr. Hann opined that Lee had "[s]ignficant psychiatric issues, possible multiple personality, or manic symptoms trigged by PTSD." R. 1743. That October, Lee told Dr. Hann that her ability to cope and her mood [were] highly variable depending on which personality she [in]habits day-to-day." R. 1715; *see* R. 1716 ("Her mood and her tolerance of stress change[] depending on her personality."). Lee had "completely separate identities" that she involuntarily "shifts in and out of when stressful situations are encountered." R. 1716. She also "continue[d] to have severe daily anxiety" and "difficulty keeping organized and giving up [sic] with appointments." *Id.* She exhibited "normal" behavior and thought content on exam. R. 1720.

In October 2020, Dr. Hann completed a detailed Mental Status Evaluation describing how Lee's mental impairments would impact her abilities to work full time. *See* R. 1592–94. Dr. Hann noted she had been Lee's primary care physician since January 2019. She diagnosed Lee

with PTSD, "dissociative identity disorder, [and] alcohol abuse," and listed Lee's primary

symptoms as "anxiety, difficulty handling any stress, labile moods with . . . anxiety and

depression, [and] poor concentration & organization." R. 1592. She opined that Lee's

impairments caused "marked" limitations overall in her abilities to "respond appropriately to

supervisors, criticism, and redirection," to maintain "concentration, persistence, and task

completion," to adapt and manage herself, and to "understand, remember, or apply information."

R. 1592–93. More specifically, Lee was "unable to maintain normal or appropriate relationships

with supervisors, co-workers and/or peers due to behavioral extremes 11-15% of the time in an 8

hour day" and "unable to complete even simple tasks in a regular and continuous work setting

11-15% of the time in an 8 hour day." R. 1592–93 (emphasis omitted). Dr. Hann expected Lee to

have "4+ bad days per month" where her symptoms would "increase[]" to the point she could not

complete an eight-hour work shift. R. 1594. Finally, Dr. Hann opined that Lee's "mental disorder

[was] 'serious and persistent,' meaning that the impairment ha[d] existed over a period of at least

2 years despite medi[c]al treatment, mental health therapy, [or] psychosocial support(s) . . . that

are ongoing and that diminish symptoms and signs of the mental disorder and marginal

adjustment meaning [Lee] has minimal capacity to adapt to change in [her] environment or

demands that are not already part of [her] daily life[.]" R. 1593–94. Dr. Hann concluded that it

was "medically reasonable to relate" the above PTSD-related "symptoms and functional

limitations back to 9/30/2018," the date Lee was last-insured for DIB. *See* R. 1594 (noting a

"more recent dissociative disorder" diagnosis after Lee's "seizure like event" in April 2020).

Lee testified at the hearing before ALJ Munday in December 2020. She explained that,

before September 2017, she was a self-employed hairstylist who saw clients in her own home, R.

61, for a few hours a day, "[a] couple of days a week," R. 58–59. She had a stylist chair at her

house and did not have a shop that was open to the public in a commercial setting. R. 60. Lee

stopped seeing her regular clients when she moved from Harrisonburg to Charlottesville in late

2017. She tried to find a job at a commercial salon, *id.*, but she "walked into [one] salon [and]

had a panic attack," R. 102. Lee had three to four panic attacks a week, but she tried "to manage"

them by avoiding triggering situations. R. 64. "There [were] lots of triggers," including "the

unknown" or "something unkind" or Lee "feeling dumb because [she] can't get the answer

right." *Id.* "[T]hat's why [she] stay[ed] home" except on "very rare[]" occasions. *Id.* Lee did

some light household chores when she could, R. 68, but her friend ran errands and did the

grocery shopping for her, R. 62.

B.     *The ALJ's Decision*

ALJ Munday summarized much of this evidence in her written decision. *See generally*

R. 21–27. At step two, she found that Lee's PTSD, depression, and "anxiety/panic" disorder

were "severe" MDIs because they "significantly limit [her] ability to perform basic work

activities," R. 19, which according to the regulations include "the abilities and aptitudes

necessary" to follow "simple instructions," exercise judgment, respond appropriately to

supervision, coworkers, and usual work situations, and deal with changes in a routine work

setting, 20 C.F.R. §§ 404.1522(b)(3)–(6), 416.922(b)(3)–(6). At step three, ALJ Munday found

that those MDIs caused "a moderate limitation" in Lee's overall abilities to interact with others

and to concentrate, persist, or maintain pace. R. 21. She based these ratings on Lee's own reports

that she had "panic attacks" and "did not leave her home due to the fear of having panic attacks,"

*id.* (citing R. 851 (Feb. 2019); R. 1240, 1243 (Oct. 2019)); Ms. Durland-Jones's notes that Lee

"struggled with completing tasks and was distracted," *id.* (citing R. 756 (Nov. 2018)); Dr. Lee's

findings that Lee "exhibited a depressed and anxious mood with periods of tearfulness" on exam

in October 2019, *id.* (citing R. 1243); and Dr. Hann's observation that Lee was "verbose and slightly manic" on exam in April 2020, *id.* (citing R. 1746).

Next, ALJ Munday concluded that Lee could "perform simple, routine tasks, 'low stress' work, defined as occasional independent decision making and few workplace changes," and tolerate "occasional interaction with supervisors" but "no interaction with the general public or co-workers." R. 22. She later explained that this RFC finding was "supported by [Lee's] mental impairments with evidence of a depressed and anxious mood, tearfulness, verbose and manic behavior, tangential thoughts, and maladaptive coping skills, reports of panic attacks, and her provider's observation that [she] struggled with completing tasks and was distracted." R. 28 (citing R. 755–56, 841, 1240, 1243–44, 1746). The cited pages document Lee's own reports of panic attacks, R. 841, 1240 (Feb., Oct. 2019); Ms. Durland-Jones's initial assessment that Lee's "thoughts can be tangential," she was "distracted," and she struggled to complete tasks and "maintain focus," R. 755–56 (Feb.–Nov. 2018); Dr. Lee's findings that Lee "exhibited a depressed and anxious mood with periods of tearfulness" on initial exam, R. 1243 (Oct. 2019), and was at "chronically elevated risk for self harm due to her mood disorder and maladaptive coping skills of drinking alcohol," R. 1244; and Dr. Hann's observation that Lee was "verbose and slightly manic" on exam in April 2020, R. 1746.

Nonetheless, ALJ Munday was "not persuaded" by Ms. Durland-Jones's specific opinions that Lee's chronic PTSD, depression, and anxiety symptoms left her "unable to meet competitive standards" when it came to getting to work on time and staying at work for eight hours a day, five days a week; sustaining an ordinary routine without special supervision; dealing with "normal work stress"; and traveling to unfamiliar places, and that those impairments caused "seriously limitations" in Lee's abilities to "maintain attention for 2-hour segments," work with

or around others "without being unduly distracted" by them, make "simple work-related

decisions," and respond appropriately to changes in a routine work setting. R. 25 (citing R. 795–

98 (Jan. 2019); R. 779 (Mar. 2019)). ALJ Munday concluded that these opinions were "not

supported by the . . . frequent normal mental findings" that Lee was cooperative, "calm, engaged,

and well-groomed" and that she had "normal" orientation, speech, thought content, memory, and

behavior; good eye contact; linear and logical thought processes; and grossly intact cognition. *Id.*

(citing R. 607, 640, 643 (Sept.–Oct. 2017); R. 661, 683, 706 (Jan.–Apr. 2018); R. 755–56, 763

(Feb.–Nov. 2018)); R. 856 (Mar. 2018); R. 877 (Sept. 2017)). ALJ Munday also concluded that

Ms. Durland-Jones's opinions were "not consistent with" evidence that Lee "demonstrated a

normal mood and affect, normal behavior, normal thought content, and normal memory even

after not taking her medications for 3 months" in late 2018. R. 25–26 (citing R. 847–50 (Jan.

2019)).

ALJ Munday gave the same "supportability" rationale, citing the same "frequent[ly]

normal mental findings" on Lee's exams, in concluding she was "not persuaded by" Dr. Hann's

medical opinions that Lee had "marked limitations" in her abilities to "respond appropriately to

supervisors, criticism, and redirection," to maintain "concentration, persistence, and task

completion," to adapt and manage herself, and to "understand, remember, or apply information"

and, more specifically, that Lee was "unable to maintain normal or appropriate relationships with

supervisors, co-workers and/or peers due to behavioral extremes 11-15% of the time in an 8 hour

day" and "unable to complete even simple tasks in a regular and continuous work setting 11-15%

of the time in an 8-hour work day." R. 26 (citing R. 607, 640, 643 (Sept.–Oct. 2017); R. 661,

683, 706 (Jan.–Apr. 2018); R. 755–56, 763 (Feb.–Nov. 2018); R. 847–50 (Jan. 2019); R. 856

(Mar. 2018); R. 877 (Sept. 2017)). ALJ Munday also found that Dr. Hann's opinions were "not

consistent with" evidence that Lee "demonstrated a normal mood and affect, normal behavior,

normal thought content, and normal memory even after not taking her medications for 3 months"

in late 2018, *id.* (citing R. 847–50 (Ja+n. 2019)), or with Lee's own reports from June 2018 that

she "could follow written and spoken instructions well, got along well with authority figures, and

handled changes in routine well," *id.* (citing R. 379–80).

Finally, ALJ Munday generally credited (or found "persuasive") both Dr. Leizer's

opinion that Lee should be "restricted to unskilled work, had difficulty sustaining attention and

concentration and trouble getting along with others," and that Lee's "symptoms would affect her

ability to interact appropriately with others," R. 27 (citing R. 134–35, 148), and Dr. McClain's

more specific opinion that Lee could "perform at least simple work for 2-hour blocks to

complete a normal workday/work week, [and] should avoid work with the public," but could

have "occasional interaction with supervisors and co-workers," *id.* (citing R. 167, 182). ALJ

Munday concluded these limitations were "supported by evidence of a depressed and anxious

mood, tearfulness, verbose and manic behavior, and tangential thoughts" and "consistent with"

Lee's own reports that she stayed home "due to fear of panic attacks" and "her provider's

observation that [Lee] struggled with completing tasks and was distracted." *Id.* (citing R. 755–

56, 841, 1240, 1243, 1746).[7] As before, the cited pages document Lee's reported panic attacks,

R. 841, 1240 (Feb., Oct. 2019); Ms. Durland-Jones's initial assessment that Lee's "thoughts can

be tangential," she was "distracted," and she struggled to complete tasks and "maintain focus,"

R. 755–56 (Feb.–Nov. 2018); Dr. Lee's findings that Lee "exhibited a depressed and anxious

---

[7] ALJ Munday did not mention any other factors bearing on these somewhat different, but
apparently equally persuasive, opinions, R. 27, such as the extent to which the DDS reviewers
were familiar with all relevant evidence in the hearing-level record, or their lack of examining
relationship with Lee. *See* 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

mood with periods of tearfulness" on initial exam, R. 1243 (Oct. 2019); and Dr. Hann's

observation that Lee was "verbose and slightly manic" on exam in April 2020, R. 1746. ALJ

Munday's RFC finding included an additional "limitation to low-stress work with occasional

independent decision making and few workplace changes" because she found that limitation to

be "consistent with this evidence as well as with the evidence of maladaptive coping skills." R.

27 (citing R. 1244 (Oct. 2019)). ALJ Munday did not explain why she rejected Dr. McClain's

opinion that Lee could tolerate "occasional" interaction with coworkers. *See* R. 22 ("no

interaction" with coworkers); *cf. Warren v. Astrue*, No. 2:08cv3, 2008 3285756, at *11 (W.D.

Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported by substantial evidence when he

fails to adequately explain his rationale for rejecting the opinions of those whom he otherwise

gave great weight to in arriving at his decision.").

     ALJ Munday's RFC assessment also indicates that she credited some of Lee's subjective

statements describing the intensity, persistence, and functionally limiting effects of her chronic

psychiatric symptoms—at least to the extent that Lee's reported "panic attacks" and fear of

leaving home justified restricting Lee to working for eight hours a day, five days a week in a

"low stress" environment where she faced "few workplace changes" and only occasionally

interacted with supervisors. R. 27–28 (citing R. 841, 1240). As for Lee's testimony describing

other essentially disabling psychiatric symptoms, however, ALJ Munday found that those

statements were "not fully supported," R. 25, solely because they were "inconsistent" with Lee's

testimony that she "did laundry, dusted, and swept when she could," went "grocery shopp[ing]"

twice a week" and "ran errands on better days," "occasionally" attended support-group meetings,

followed "instructions well, got along well with authority figures, and handled changes in routine

well," R. 23 (citing R. 379–80). *But see Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 263

(4th Cir. 2017) (reversing and remanding in part because "the ALJ provided no explanation as to how those particular [daily] activities—or any of the activities depicted by Brown—showed he could persist through an eight hour workday" five days a week); *Ashcraft v. Colvin*, No. 3:13cv417, 2015 WL 9304561, at *12 (W.D.N.C. Dec. 21, 2015) ("The Fourth Circuit has long held that the ability to perform sporadic daily activities is not inconsistent with a claim of disability." (citing *Totten v. Califano*, 624 F.2d 10 (4th Cir. 1980)). Thus, ALJ Munday appears to have rejected *any* evidence (medical and nonmedical) that Lee's complex psychiatric symptoms (e.g., "excessive worry, overly fearful thinking," "intrusive memories of abuse," "overwhelming anxiety," R. 797; "persistent and intrusive thoughts of self blame and self criticism," daily "significant fatigue," R. 764; "profound social anxiety," night terrors, insomnia, R. 375, 419–20; "recurrent severe panic attacks" multiple times a week, R. 795; hypervigilance, R. 779, 841; chronically depressed and anxious mood with trouble concentrating, R. 420, 511–12, 639–40, 727, 775, 779, 795–97, 843, 848, 876–77, 922, 1159, 1173; and "persistent distrust of others," R. 923; *see* R. 1239–40) were so continuous and/or so severe that they prevented Lee from working outside her home for eight hours a day, five days week.

B.     *Discussion*

Lee primarily challenges ALJ Munday's conclusions, made as part of her RFC analysis, that Ms. Durland-Jones's and Dr. Hann's medical-source opinions were "not persuasive" because they were "not supported by" various normal findings on Lee's mental-status exams between September 2017 and November 2018, R. 25–26 (citing R. 607, 640, 643, 661, 683, 706, 755–56, 763, 856, 877), and "not consistent with" the normal findings on Lee's mental-status exam in January 2019, "even after not taking her medications for 3 months," *id.* (citing R. 847–50). ALJ Munday further found that Dr. Hann's opinion was "not consistent with" Lee's own

reports from June 2018 that she "could follow written and spoken instructions well, got along

well with authority figures, and handled changes in routine well," R. 26 (citing R. 379–80).

A claimant's RFC is her "maximum remaining ability to do sustained work activities in

an ordinary work setting" for eight hours a day, five days a week despite her medical

impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis

omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case

record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect

specific, credibly established "restrictions caused by medical impairments and their related

symptoms" that affect the claimant's "capacity to do work-related physical and mental activities"

on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–

40 (4th Cir. 2015). "Medical opinions"—i.e., statements from a medical source about what the

claimant "can still do despite" her MDIs and whether she has "impairment-related limitations or

restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R.

§§ 404.1513(a)(2), 416.913(a)(2)—can be critical to a proper RFC analysis. *See, e.g.*, *Woods v.

Berryhill*, 886 F.3d 686, 695 (4th Cir. 2018).

For DIB and SSI claims filed after March 27, 2017, ALJs must "articulate in [the] . . .

decision how persuasive [they] find all of the medical opinions" in the claimant's record to be,

20 C.F.R. §§ 404.1520c(b), 416.920c(b), using the relevant factors listed in the regulations, "as

appropriate," *id.* §§ 404.1520c(a), 416.920c(a). "[S]upportability and consistency are the most

important factors [ALJs] consider when [they] determine how persuasive [they find] a medical

source's medical opinion . . . to be." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2) (cleaned up). ALJs

therefore "will explain how [they] considered" those two specific factors when evaluating a

medical source's medical opinion. *Id.* "Supportability" looks at the "objective medical evidence

and supporting explanations presented by a medical source . . . to support his or her [own] medical opinion(s)[.]" *See id.* §§ 404.1520c(c)(1), 416.920c(c)(1). The "more relevant" the evidence and explanations "presented by a medical source are to support his or her medical opinion(s), the more persuasive" those opinions will be. *Id.* "Consistency," on the other hand, compares the medical opinion to *other* relevant evidence in the claimant's record. *See id.* §§ 404.1520c(c)(2), 416.920c(c)(2). "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the [record], the more persuasive the medical opinion(s) . . . will be." *Id.* ALJs "may, but [generally] are not required to, explain how [they] considered" other regulatory factors, *id.*, such as the source's medical specialty, familiarity with the record, or treating relationship with the claimant. *See id.* §§ 404.1520c(b)(3), 416.920c(b)(3).

These regulations are more flexible than their prior versions, which required ALJs to evaluate "treating source" medical opinions under a special two-part standard to determine if they were entitled to "controlling weight" and to explicitly consider each of five regulatory factors when assigning specific weights to every medical opinion in the claimant's record. *See, e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir. 2021) (citing 20 C.F.R. § 404.1527(c) (2016)); *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c) (2016)); 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2017) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from your medical sources."). Even under these new regulations, an ALJ "cannot reject an examining or treating [source's] opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakaszi*, 32 F.4th 785, 792 (9th Cir. 2022). Fundamental principles of judicial review also still

apply. "[A] proper RFC analysis," for example, "has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). "The second component, the ALJ's logical explanation" of how she weighed relevant evidence and arrived at her RFC findings, "is just as important as the other two." *Id.* "This requires the ALJ to 'present [the court] with findings and determinations sufficiently articulated to permit meaningful judicial review.'" *Testamark*, 726 F. App'x at 399 (quoting *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)). When the court is "'left to guess' as to how the ALJ reached her evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of her conclusions," *id.* (quoting *Mascio*, 780 F.3d at 638), to ensure "the ALJ's decision is supported as a matter of fact and law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). *See, e.g.*, *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) ("[E]ven under this deferential standard, we do not reflexively rubber-stamp an ALJ's findings. To pass muster, ALJs must build an accurate and logical bridge from the evidence to their conclusions." (cleaned up)).

ALJ Munday articulated how she considered the "supportability" and "consistency" factors in concluding that Ms. Durland-Jones's opinion and Dr. Hann's opinion were "not persuasive." *See* R. 25–26. And, read in isolation, some of her reasons seem to make sense. For example, it is not necessarily unreasonable to say the opinions' work-preclusive restrictions on Lee's social interaction, *see* R. 796–97, 1592–93, were "not supported by" these providers' own findings that Lee was "engaged, calm, and well groomed," and frequently exhibited "cooperative behavior," "good eye contact," and "normal" speech, thought content, and behavior, R. 26 (citing R. 755, 850). The problem, however, is that "the ALJ's evaluation of the medical opinions of record fails to provide the 'holistic and fact-specific evaluation' of [Lee's] mental impairments

that the RFC determination requires." *Testamark*, 736 F. App'x at 399 (quoting *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017)).

First, ALJ Munday's conclusion that these providers' medical opinions about Lee's longstanding "significant psychiatric issues," R. 1743, and near-inability to function outside her home or deal with normal stress on an almost daily basis, *see, e.g.*, R. 756, 779, 795–98, 922, 923, 930, 1592–94, were "inconsistent" with one normal mental-status exam in January 2019, R. 25–26 (citing R. 847–50), improperly relied on an isolated event "while overlooking the record's broader import," *Testamark*, 736 F. App'x at 395. "Because symptoms of mental illness may wax and wane over the course of treatment, the fact that [Lee] exhibited fair judgment or appeared cooperative on certain specific occasions is not inconsistent with the conclusion that she is unable to work." *Id.* at 398–99. ALJ Munday acknowledged other specific occasions where Lee exhibited "depressed and anxious mood, tearfulness, verbose and manic behavior, and tangential thoughts" on mental status exams, R. 27 (citing R. 755–56, 841, 1240, 1243–44, 1746), but she did not explain how those abnormal findings factored into her evaluation of Ms. Durland-Jones's and Dr. Hann's medical opinions. *See* 20 C.F.R. §§ 404.1520c(c)(1)–(2), 416.920c(c)(1)–(2).

Second, while ALJ Munday's analysis of these providers' medical opinions highlighted Lee's frequently normal mental-status exams, R. 26–27, her RFC assessment as a whole either skipped or glossed over every single instance where Lee told healthcare providers that she had significant, ongoing psychiatric symptoms and functional limitations—including profound social anxiety, agoraphobia, and inability to deal with normal stress—even though her mental-status exams were mostly normal on those days. *See, e.g.*, R. 511–13, 727–29, 763–64, 834–37, 841, 848–50, 877, 1159–62, 1173–177, 1239–44, 1450–53, 1467–70, 1716–20, 1828–30. An ALJ

must "consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (internal quotation marks omitted). Here, it is not clear whether ALJ Munday considered Lee's repeated complaints, but discounted "or rejected them for a legitimate reason grounded in the available evidence, or whether she improperly ignored them," *Shannon R. v. Kijakazi*, No. 5:20cv84, 2022 WL 636638, at *12 (W.D. Va. Mar. 4, 2022), when evaluating Ms. Durland-Jones's and Dr. Hann's medical opinions for supportability and consistency. ALJ Munday also overlooked Ms. Durland-Jones's various "supporting explanations," 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1), why Lee's chronic, persistent PTSD symptoms were a reliable gauge of her actual impairment-related functional limitations even though Lee generally had normal (or mixed) findings on mental-status exams. *See, e.g.*, R. 756, 779, 797, 923.

Third, ALJ Munday did not explain why Dr. Hann's opinions about Lee's near-inability to get to work on time, to maintain appropriate relationships with supervisors "due to behavioral extremes," and to concentrate long enough to "complete even simple tasks" in a normal work setting for eight hours, five days a week, R. 1592–93, were "inconsistent" with Lee's one-off report to DDS that she "could follow written and spoken instructions well, got along well with authority figures, and handled changes in routine well," R. 26 (citing R. 380 (June 2018)). *Cf. Hines*, 453 F.3d at 565 (explaining that substantial evidence did not support ALJ's finding that claimant's testimony describing his significant functional limitations was "inconsistent" with his testimony describing daily activities "because the record, when read as a whole, reveal[ed] no inconsistency between the two"). Moreover, the longitudinal record is replete with instances where Lee and/or her healthcare providers indicated that Lee could not deal appropriately with supervisors, that normal stressors caused her to shut down or triggered maladaptive coping skills,

and that she did not do well with changes in routine or "the unknown." *See, e.g.*, R. 62–64, 117–18, 764, 380, 419–20, 422–43, 779, 795–97, 922–23, 1240, 1243–44, 1450, 1715–16, 1743–44, 1802, 1828. This evidence conflicts with Lee's statements to DDS in June 2018, which the ALJ apparently credited, and is arguably more consistent with Dr. Hann's medical opinions about Lee's specific impairment-related limitations in these functional areas, which the ALJ essentially rejected. Again, ALJ Munday did not explain how she considered any of this evidence when articulating why she found Dr. Hann's opinions "not persuasive," R. 26. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 764 (W.D. Va. 2002).

Finally, ALJ Munday's analysis of the medical opinion evidence as part of her broader RFC assessment is internally inconsistent. For example, she cited various *abnormal* findings on Lee's mental-status exams between February 2018 and April 2020, R. 27 (citing R. 755–56, 1243–44, 1746), as well as Lee's own reports in February and October 2019 that she suffered from ongoing panic attacks and agoraphobia, *id.* (citing R. 841, 1240), in concluding that the DDS reviewing psychologists' work-permissive opinions *were persuasive*. R. 27. She did not explain why only the DDS opinions, and not Dr. Hann's and Ms. Durland-Jones's work-preclusive opinions, were "supported by" and "consistent with" those abnormal objective findings and Lee's reported symptoms and functional limitations. R. 25–27. Nor did she explain why the frequently "normal" objective findings Lee's mental-status exams and Lee's reported abilities to follow instructions and handle changes undercut Dr. Hann's and Ms. Durland-Jones's opinions, but, somehow, they did not undercut the DDS reviewers' opinions that Lee should be limited to simple, unskilled work and minimal social interaction, R. 26–27. *See Strong v. Astrue*, No. 8:10cv357, 2011 WL 2938084, at *12 (D.S.C. June 27, 2011) (noting that ALJ's "internally inconsistent findings" precluded meaningful judicial review). The ALJ also failed to explain why

her RFC finding restricted Lee to "low stress work," defined in part as "few workplace changes," R. 22, when Lee ostensibly "handled changes in routine well," R. 26. In short, ALJ Munday's "failure to build an accurate and logical bridge from the evidence to [her] conclusions" when evaluating the various medical opinions in Lee's record is legal error and requires remand. *See Arakas*, 983 F.3d at 95.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 15, **REVERSE** the Commissioner's final decisions denying Lee's DIB claim and denying Lee's SSI claim for the period between February 2018 and July 2019, and **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g).

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: September 2, 2022

Joel C. Hoppe
U.S. Magistrate Judge